1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    KEVIN GELASIO,                          Case No. 3:24-cv-01555-JSC

8                 Plaintiff,

9         v.                                 ORDER RE: DEFENDANTS' MOTION
                                             TO DISMISS
10   HARIS BIN ZAFAR, et al.,
                                             Re: Dkt. No. 18
11               Defendants.

12

13        Kevin Gelasio sues Haris Bin Zafar and Project Ether Limited ("Project Ether"), alleging

14   breach of contract and various other causes of action arising from Gelasio's loans and assistance in

15   creating Project Ether, an art project involving non-fungible tokens (NFTs).  (Dkt. No. 1.)[1]  Now

16   pending before the Court is Zafar and Project Ether's motion to dismiss the complaint for lack of

17   personal jurisdiction.  (Dkt. No. 18.)  Having considered the briefing, the August 15, 2024 oral

18   argument, and the post-hearing supplemental briefing, the Court GRANTS Defendants' motion.

19   Plaintiff has not met his burden to establish Defendants purposefully availed themselves of

20   California laws or purposefully directed any relevant activity to California.  Moreover, even if

21   Plaintiff had met his burden, Defendants have established the exercise of jurisdiction would not be

22   reasonable.

23                                    COMPLAINT ALLEGATIONS

24        "Kevin Gelasio is an individual and California resident."  (Dkt. No. 1 ¶ 10.)  "Haris Bin

25   Zafar is an individual and resident of the United Kingdom."  (Id. ¶ 11.)  Project Ether "is a

26   corporation organized under the laws of Hong Kong SAR [Special Administrative Region], China

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

with its principal place of business in the United Kingdom." (*Id.* ¶ 12.)

Zafar, who is "an Internet artist," "conceived of the idea" of Project Ether in June 2021. (*Id.* ¶¶ 3, 17.)  Project Ether is "an art project whereby users could purchase procedurally generated graphical character renderings to use as 'profile pictures' across social media by either (i) 'minting' a non-fungible token ('NFT') on the Ethereum blockchain in the first instance for a set fee, or (ii) purchasing an already-minted NFT on the secondary market." (*Id.* ¶ 3.)

"Gelasio and Zafar first met in July 2022 after connecting over Discord—an online messaging platform that became their primary means of communication." (*Id.* ¶ 16.)  "Shortly after meeting, Zafar shared his early artwork for Project Ether and began regaling Gelasio with his grand vision of Project Ether evolving into a luxury lifestyle brand that would 'change the world.'" (*Id.*)

Zafar "quickly brought [Gelasio] on to Project Ether as an advisor." (*Id.* ¶ 18.)  "In exchange for his services, Gelasio was supposed to receive a certain number of 'whitelist' spots in Project Ether's eventual mint as well as five percent of Project Ether's mint proceeds." (*Id.*)

"On August 25, 2022, Zafar . . . request[ed] $5,000.00 from Gelasio to 'pay the animators'" and promised to "pay it back." (*Id.* ¶ 21.)  "Gelasio agreed and sent the requested funds." (*Id.*)  "On September 4, 2022, Zafar followed-up with Gelasio to 'ask for a favor,'" and asked for an additional $50,000.00 in funding.  (*Id.* ¶ 23.)  "Gelasio agreed to loan another $50,000.00 in exchange for receiving (1) an additional five percent (bringing Gelasio's total promised share to ten percent) of Project Ether's mint proceeds, (2) fifteen percent of royalties collected from secondary sales, (3) twenty-five to thirty percent of the-then-yet-to-be-formed Project Ether Ltd.'s equity, and (4) repayment of all borrowed sums immediately following Project Ether's mint." (*Id.* ¶ 24.)  "After agreeing to those terms, Gelasio sent the $50,000.00 to Zafar over the blockchain on September 5, 2022." (*Id.*)  After more requests in November 2022, Gelasio "agreed to provide[] Zafar with another $50,000.00 in funding." (*Id.* ¶ 25.)

For "the next nine-months," Gelasio felt "more-and-more pressure to continue extending loans for Project Ether's ongoing development," as well as "loans to cover Zafar's living and other personal expenses." (*Id.* ¶ 26.)  "Ultimately, Gelasio extended eighteen loans to Zafar—three

Personal Loans and fifteen Project Loans" for a total of $755,837.33.  (*Id.*)  "While Gelasio (at least at the time) believed in Zafar's abilities and motives, Gelasio reiterated their agreement that all lent funds would be repaid immediately after Project Ether's mint concluded with practically each and every one of the Personal Loans and Project Loans he made."  (*Id.* ¶ 27.)  "And, each time, Zafar assured Gelasio that their previously-agreed arrangement would be honored."  (*Id.*)  "Furthermore, Zafar even personally guaranteed repayment of all sums lent by Gelasio, pledging his own assets if necessary."  (*Id.*)

On January 16, 2023, Zafar "slashed Gelasio's previously-negotiated compensation by more than half, claiming this ostensible 'reduction' was appropriate because Gelasio's 'faith' in Zafar and Project Ether had purportedly waned."  (*Id.* ¶ 29.)  "Zafar demanded [] that Gelasio quit his full-time nursing job as a show of 'faith' in Zafar's artistic abilities."  (*Id.* ¶ 30.)  "When Gelasio pushed back on Zafar's unreasonable demands, Zafar threatened to abandon Project Ether altogether and build a copycat competitor from the ground up—a not-so-subtle-threat to pull the rug out from underneath Gelasio and run off with the amounts already lent to Zafar."  (*Id.* ¶ 31.)

"By the time Project Ether's mint concluded on July 13, 2023," Gelasio had "lent his lifesavings and quit his full-time nursing job (at Zafar's insistence) to further assist with Project Ether's development and marketing."  (*Id.* ¶ 34.)

"After Project Ether's mint concluded, Zafar refused to promptly repay the Personal Loans and Project Loans despite having adequate funds on hand between Project Ether's treasury and Zafar's anticipated share of the mint proceeds."  (*Id.* ¶ 35.)  "In fact, Zafar failed to honor any of the compensation promises he made to Gelasio in September 2022, offering only a meager five percent share in Project Ether Limited (instead of the promised twenty-five to thirty percent) when it was formed in or around February 2023."  (*Id.*)

"When Project Ether's mint concluded on July 13, 2023, Defendants' debts to Gelasio matured."  (*Id.* ¶ 41.)  However, "[t]o date, Zafar has steadfastly refused to repay" the $755,837.33 Zafar owes Gelasio.  (*Id.*)  Moreover, Zafar "purport[ed] to meet with Gelasio in good-faith to 'come to an understanding,'" then Zafar "lured Gelasio into a conference call with several other individuals who worked on Project Ether to attempt to bully Gelasio into walking away from the

project."  (*Id.* ¶ 42.)  "Zafar recorded that call without Gelasio's consent and later posted it on YouTube."  (*Id.*)

"When Gelasio insisted that Zafar repay the Personal Loans and Project Loans, Zafar retaliated by banning Gelasio from Project Ether's Discord server and unilaterally announcing Gelasio's departure from Project Ether to their more than 20,000 community members on Discord."  (*Id.* ¶ 43.)

Gelasio brings 12 causes of action against both Zafar and Project Ether: (1) Breach of Contract, (2) Open Book Account, (3) violation of California Penal Code § 496, (4) violation of California Penal Code § 632, (5) conversion, (6) fraud, (7) constructive fraud, (8) breach of fiduciary duty, (9) promissory estoppel, (10) unjust enrichment, (11) constructive trust, and (12) declaratory relief.

## DISCUSSION

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see also* Fed. R. Civ. P. 4(k)(1) ("Serving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."). "Because 'California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution,'" the Court's "inquiry centers on whether exercising jurisdiction comports with due process."  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG*, 571 U.S. at 125); *see also* Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."); *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) ("Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004))).  Due process requires that the defendant "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S.

457, 463 (1940)).

Plaintiff "bears the burden" of establishing personal jurisdiction exists.  *In re Boon Global Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019).  The Court may consider declarations and other evidence outside the pleadings to determine whether it has personal jurisdiction.  *Id.*  "[U]ncontroverted allegations in plaintiff's complaint must be taken as true," but courts "may not assume the truth of allegations in a pleading which are controverted by affidavit."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (cleaned up).  Any "factual disputes" must be "resolve[d] . . . in the plaintiff's favor."  *Id.*

"Federal due process permits a court to exercise personal jurisdiction over a nonresident defendant if that defendant has 'at least minimum contacts with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.'"  *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 801).  "[T]he relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the defendant himself creates with the forum State.'"  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  Moreover, "the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'"  *Id.* (quoting *Walden*, 571 U.S. at 285.)

General jurisdiction occurs when a defendant's "contacts [are] so continuous and systematic as to render a defendant essentially at home in the forum state and amenable to any suit there."  *Id.*  Specific jurisdiction occurs when the "issues deriving from, or connected with, the very controversy [] establish[] jurisdiction."  *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Zafar is a resident of the United Kingdom and Project Ether is organized under the laws of Hong Kong with its principal place of business in the United Kingdom.  (Dkt. 1 ¶¶ 11, 12).  Neither Defendant is "essentially at home" in California, and Plaintiff does not contend either Defendant is amenable to general jurisdiction in California.  (*See* Dkt. No. 22 at 11 (arguing only for specific jurisdiction)).  So, the Court focuses its analysis on

whether either Defendant is subject to specific jurisdiction in California.[2]

The Ninth Circuit "use[s] a three-prong test for analyzing claims of specific jurisdiction." *Glob. Commodities Trading Grp., Inc.*, 972 F.3d at 1107. "First, '[t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.'" *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802). "'[P]urposeful availment' and 'purposeful direction' are distinct concepts": "[p]urposeful availment" is applied "for claims sounding in contract, while purposeful direction" is used for "claims in tort." *Id.* Because this complaint involves both contractual causes of action and tort causes of action, the Court will consider both purposeful availment and direction. "Second, the claim must arise out of or relate to the defendant's forum-related activities." *Id.* at 1107. "Finally, the exercise of jurisdiction must be reasonable." *Id.* Plaintiff "must satisfy the first two prongs of this test," at which point the burden shifts to the defendant to demonstrate the exercise of jurisdiction would be unreasonable. *Id.*

### A. Purposeful Availment and Direction

#### 1. Purposeful Availment

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. "By taking such actions, a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "In return for these 'benefits and protections,' a defendant must—as a quid pro quo—'submit to the burdens of litigation in that forum.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). "[B]usiness activity constitutes purposeful availment when that activity reaches out and creates continuing relationships and obligations in the forum state." *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir.), *cert. denied*, 144 S. Ct. 91 (2023)

---

[2] The parties do not distinguish between the two Defendants in their personal jurisdiction analysis, so neither does the Court.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (cleaned up).

2        It is undisputed Gelasio originally contacted Zafar.  Specifically, "[o]n June 18, 2022"

3   Gelasio sent a "direct message on X" to Zafar, in which Gelasio "introduce[ed] himself as the

4   founder of OxValley (a cryptocurrency community)," told Zafar "he enjoyed [Zafar's] work and

5   requested 'whitelist' (early) access to . . . Project Ether."  (Dkt. No. 19 ¶ 3.)  Before Gelasio

6   contacted Zafar, the two had never met.  (*Id.*)  So, Zafar did not initially "directly solicit[] business

7   in the forum state."  *Decker Coal Co.*, 805 F.2d at 840; *see also Sarkis v. Lajcak*, 425 F. App'x

8   557, 558 (9th Cir. 2011) (holding no purposeful availment when the defendant "negotiated and

9   entered into a contract with a California resident," because the defendant "did not seek out a

10   California resident," so "[i]t was purely fortuitous that [the plaintiff] had a California address

11   when the parties negotiated his contract"); *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154,

12   1164 (9th Cir. 2023), (holding no purposeful availment when there was no evidence the defendant

13   "sought out" the plaintiff in the forum state, or "benefited from" the plaintiff's residence in forum

14   state, and "[n]either the contract's negotiations, terms, nor contemplated consequences establish

15   that [the defendant] formed a substantial connection with" the forum state, even though employees

16   of the defendant entered the "forum state several times"), *cert. denied*, 144 S. Ct. 826 (2024).

17        While Plaintiff does not dispute he originally contacted Zafar, he insists Defendants

18   purposeful availed themselves of the privilege of doing business in California because they

19   "knowingly entered into a continuing business relationship with a California resident by

20   requesting—and accepting—eighteen different loans over the course of twelve months."  (Dkt.

21   No. 22 at 13.)   But, Plaintiff also alleges he was a co-founder of Project Ether, and that his loans

22   were part of his role as Project Ether's financier.  (Dkt. No. 1 ¶ 5-6.)  And it is undisputed Project

23   Ether LLC is a Hong Kong corporation (Dkt. No. 19-4), that Plaintiff paid to have Sky-

24   Consulting, a Singapore-based company, incorporate Project Ether in Hong Kong (Dkt. No. 19 at

25   3 ¶¶ 7, 8), and that each draft of the proposed founders' agreement which Plaintiff paid to have

26   drafted (although no draft was ever executed) had a foreign selection clause indicating the

27   agreement would be governed by Hong Kong law.  (Dkt. Nos. 19-8 § 14.1; 19-9 § 14-1; 19-10 §

28   14.1.)  And Zafar has "never traveled to California for any purpose."  (Dkt. No. 19 ¶ 11.)  Further,

all the communication between the parties was done via the phone or internet.

Such contact is not sufficient to establish jurisdiction. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir. 1988) ("The parties conducted contract execution and termination by international mail. Such contacts are insufficient to constitute an act purposefully availing SICC of California laws."); *Roth v. Garcia Marquez*, 942 F.2d 617, 621–22 (9th Cir. 1991) ("When a California business seeks out purchasers in other states . . . [and] deals with them by out-of-state agents or by interstate mail and telephone, it is not entitled to force the customer to come to California to defend an action on the contract." (quoting *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1252 (9th Cir. 1980))); *LeGarie v. Nurse*, No. 21-CV-04739-JCS, 2021 WL 5771144, at *5 (N.D. Cal. Dec. 6, 2021) ("The location of the negotiations does not support purposeful availment here because [the defendant] did not travel to California to conduct any negotiations. . . . The fact that [the defendant] contacted [the plaintiff] in California by telephone during the negotiations does not support purposeful availment.").

Plaintiff emphasizes that "Defendants used the services of multiple United States and California-based companies in their course of dealing with Plaintiff." (Dkt. No. 22 at 13.) Specifically, Plaintiff identifies Defendants' use of "(1) Discord to induce and threaten Plaintiff to enter the at-issue transactions; (2) Coinbase to receive USDC (a centralized United States based stablecoin) from Plaintiff, sell that USDC, and use those sale proceeds to pay Project Ether's vendors; and (3) Twitter [Now, X Corp.] to advertise and market Project Ether."[3] (*Id.*) But use of such communication platforms, social media websites, or cryptocurrency exchanges does not establish purposeful availment. *See, e.g.*, *A Pseudonym Victim One v. Doe*, No. 23-CV-04610-KAW, 2023 WL 8813530, at *1 (N.D. Cal. Dec. 20, 2023) (rejecting the theory that "unlawfully access[ing] Plaintiff's @yahoo.com account using a gmail.com account" is sufficient to create jurisdiction in California even though "the @yahoo.com and @gmail.com accounts are hosted and

---

[3] Gelasio's declaration indicates Discord is "a California-based company with its headquarters in San Francisco;" X Corp. "is a social media company headquartered in California;" and Coinbase Global, Inc. "is a United States cryptocurrency exchange and service provider that is incorporated in Delaware and (before becoming 'a remote-first company' that purportedly does 'not maintain a headquarters' in 2021) was headquartered in San Francisco, California." (Dkt. No. 22-1 ¶ 3, and at 2-3 nn. 1-2.)

United States District Court
Northern District of California

1   maintained in California").

2       *Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015), supports the conclusion personal

3   jurisdiction is lacking here.  In *Picot*, one plaintiff resided in California and the other in Nevada;

4   the defendant resided in Michigan.  *Id.* at 1209.  The three men attempted to "develop and sell

5   their own electrolyte formula for use in hydrogen fuel cells."  *Id.*  The defendant spent weeks

6   working "to develop and market the technology at his office in Sterling Heights, Michigan."  *Id.* at

7   1210.  "On two occasions, [the defendant] left his Michigan office to travel to California": first, he

8   traveled to California for "for approximately two weeks to help" one plaintiff "set up a

9   demonstration for a potential client [the other plaintiff] had contacted," and second he went to

10  California at the "request" of the plaintiffs to "help with another demonstration."  *Id.*  The

11  plaintiffs agreed to sell the technology the three men had developed and "agreed that the money

12  would be paid into two pass-through trusts, one in Wyoming and one in Australia."  *Id.*  "The

13  contract" for sale "was executed in Los Angeles, California."  *Id.*  After the sale, the defendant and

14  the non-California plaintiff exchanged "a series of emails and phone calls."  *Id.*  The defendant

15  then threatened to sue if he did not receive the share of the proceeds according to an alleged oral

16  agreement, and the plaintiffs filed suit seeking a declaration no oral agreement existed between the

17  parties.  *Id.*

18      The Ninth Circuit held the plaintiffs failed to demonstrate the defendant "had sufficient

19  minimum contacts with California to subject him to specific personal jurisdiction," because any

20  "agreement" between the parties "was formed in Michigan, where [the defendant] lived, where it

21  was understood [the defendant] would perform the majority of his work, and where [the

22  defendant] did indeed discharge most of his contractual duties."  *Id.* at 1212.  Even though the

23  California-based plaintiff "fulfilled his obligations under the agreement by seeking out investors

24  and buyers in California," the court held the plaintiff's contacts with the defendant were not the

25  focus of the jurisdictional analysis, and so the plaintiff's California activities could not subject the

26  defendant to jurisdiction in California.  The court explained "that a contract envisions one party

27  discharging his obligations in the forum state cannot, standing alone, justify the exercise of

28  jurisdiction over another party to the contract."  *Id.* at 1213.  Moreover, even though the defendant

United States District Court
Northern District of California

1    traveled to California twice, the defendant's "transitory presence" in California held "no special

2    place in" the defendant's "performance of the agreement as a whole," and were at most "merely

3    'random, fortuitous, or attenuated'" contacts.  *Id.* at 1213 (quoting *Burger King*, 471 U.S. at 475.)

4    Similarly, in this case all of Defendants' actions took place outside California.  While Plaintiff

5    took actions to perform the contract within California, the Plaintiff's actions, alone, are

6    insufficient to establish personal jurisdiction over Defendants in California.

7        Plaintiff's reliance on *Silk*, 65 F.4th at 457–58, is unavailing.  In *Silk*, the plaintiff

8    "provided tax-and estate-planning services to Frank Bond" for "more than two decades."  *Id.* at

9    448.  The plaintiff sued Bond's estate after his death, alleging breach of contract claims based on

10   unpaid fees arising from his contracts with Bond.  *Id.* at 449.  The Ninth Circuit held the defendant

11   "established purposeful contact with California via his contracts with . . . a California resident[]

12   for services" because the defendant "created a multi-year business relationship 'that envisioned

13   continuing and wide-reaching contacts' with [the plaintiff] in California," and "continuing

14   obligations" to the plaintiff.  *Id.* at 457 (quoting *Burger King*, 471 U.S. at 480).  The court

15   explained when the plaintiff "performed financial services for [the defendant] he did so from

16   California, and the relevant contracts list [the plaintiff's] California address," so "[c]laims arising

17   out of the alleged breach of those contracts therefore arise out of forum-based activities."  *Id.*

18   While the defendant "did not travel to California to conduct business with [the plaintiff]," the

19   court held it was "reasonable for California courts to exercise specific personal jurisdiction over

20   his Estate given [the defendant's] retention of a California-based financial advisor who performed

21   all the contracted-for services from California."  *Id.*

22       This case shares some similarities with *Silk*.  Drawing reasonable inferences in Plaintiff's

23   favor, Defendants contracted with Plaintiff for Plaintiff's financing services (lending).  In doing

24   so, Defendants created a year-long business relationship with Plaintiff who resided in California.

25   Moreover, by contracting with Plaintiff, Defendants created continuing obligations to Plaintiff.

26   And that conduct gives rise to this action.  Finally, Plaintiff performed all the contracted-for-

27   services (a series of loans) from California.

28       But, the contacts here are not as strong as in *Silk*.  In *Davis*, the Ninth Circuit explained:

10

> While *Silk* shows that physical travel to the forum state may not be necessary to establish purposeful availment, it illustrates the level of substantial connections under a contractual relationship that may suffice. . . .  There, the defendant sought out a contractual relationship in the forum state that would require all related work to take place in that state. .  .  . The contract referenced the forum state and the defendant paid into forum-state bank accounts, mailed paper copies of relevant documents to the forum state each month for two decades, and at times sent family members to the forum state for contract-related meetings on his behalf. . . . . In comparison, Cranfield's interactions with Idaho are far more random, fortuitous, and attenuated, making this case more like *Picot* than *Silk*.

71 F.4th at 1165–66.  As in *Davis*, there is no evidence that Defendants sent money to California state bank accounts, that any paper copies of anything were mailed to California ever (let alone for two decades), and that Zafar or anyone sent by Zafar ever visited Plaintiff in California.  Further, as the *Davis* court observed, the defendant in *Silk* "sought out a contractual relationship in the forum state."  *Id.*  Here, Defendants did not seek out a contractual relationship in California; it was Plaintiff who sought out Zafar by contacting him on Discord, (Dkt. No. 19 ¶ 3), and the business relationship Plaintiff initiated led to the loans at issue, even accepting Defendants solicited the loans.  So, just as in *Davis*, Plaintiff has failed to establish Defendants purposefully availed themselves of California.

Plaintiff's citation to *Easter* is also unavailing.  *Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004).  Plaintiff asserts in *Easter* the court found the "relationship between resident borrower and foreign lender sufficient for personal jurisdiction."  (Dkt. No. 22 at 13 (citing *Easter*, 381 F.3d at 961).)  But, in *Easter* the defendants "availed themselves of the protections of Washington law because they [were] beneficiaries of deeds of trust" securing Washington real estate.  *Id.* at 961.  Because "[t]he deeds of trust convey[ed] a property interest in Washington realty," and the defendants "expect[ed] Washington law to protect" that interest, the defendants had purposefully availed themselves of Washington law.  *Id.*  That is not the case here.  The payments from Plaintiff to Defendants are not secured by any California property and involve a company incorporated in Hong Kong.

At oral argument, Plaintiff indicated *Roth* was his strongest Ninth Circuit case.  In *Roth*, the Ninth Circuit indicated even if the plaintiff, rather than the defendant, "initiated all the

11

contacts" between the parties and "'reached out' to effect the contract," there can still be personal jurisdiction in the plaintiff's resident state if the defendant has sufficient minimum contacts with that state.  942 F.2d at 621.  But in *Roth*, some of the contract negotiations took place in California.  *Id.*  Moreover, the *Roth* court acknowledged it was a "very close call" and its finding of jurisdiction was based on the "*future consequences*" of the parties' contract.  *Id.* at 622.  That contract involved a film, "most of the work for which would have been performed in California." *Id.*  Specifically, "all of the editing, production work, and advertising would have occurred in California," and the "check that [the plaintiff] would have sent [the defendant] . . . would have depended upon activities in California."  *Id.*  In contrast, most of the work for Project Ether involved Defendants' work in the United Kingdom.  So, the future consequences of the parties' contract do not primarily involve California as in *Roth*.

Plaintiff also asserts "Defendants also utilized and benefitted from services provided by [] California residents, including Project Ether's smart contract developer," and Plaintiff himself. (Dkt. No. 22-1 ¶ 11.)  Plaintiff does not allege any of the services provided by the "smart contract developer" relate to any of his causes of actions, so any allegations as to contacts with that developer would fail at the second step of the analysis as the causes of action do not arise out of or relate to the developer's conduct.  Moreover, as discussed above, Plaintiff's own services—in acting as an advisor and financer of the UK company while living in California—cannot alone establish purposeful availment.  *See Picot*, 780 F.3d at 1213 (cautioning courts not to "mistakenly allow a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis" because the proper "inquiry is limited to examining contacts that proximately result from actions by the defendant *himself*" (cleaned up)); *Davis*, 71 F.4th at 1165 (holding no purposeful availment when the plaintiff "compensated [the defendant] from" the forum state and the defendant's employees "engaged in several telephone calls, emails, and other correspondence" related to consulting work for the plaintiffs while the defendant employees were in England).

Finally, Plaintiff argues "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal," quoting *Teras Cargo Transp. (Am.), LLC v. Cal Dive Int'l (Australia) Pty Ltd.*, No. 15-CV-03566-JSC, 2015 WL 6089276, at *5 (N.D. Cal. Oct. 16, 2015);

*see also Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) ("Agency relationships. . . may be relevant to the existence of specific jurisdiction. . . . [A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.").  Plaintiff argues Defendants hired him "first as an advisor, then as a lender, and ultimately—as a 'Co-Founder' and shareholder."  (Dkt. No. 22 at 14.)  Plaintiff also asserts "Zafar directed [him] to write and publish Tweets (from California) advertising and marketing for Project Ether."  (*Id.*)  Plaintiff therefore urges the Court to attribute Plaintiff's own conduct "to Defendants" because Plaintiff worked as "Defendants' agent" and Defendants knew Plaintiff lived in California.  (*Id.* at 15.)  However, Plaintiff's claims do not arise out of Defendants' request for Plaintiff to publish a tweet (*see* Dkt. No. 22 at 18 ("Gelasio's contract-and-fraud-based causes of action . . . are each premised on Defendants' repeated promises to borrow sums" of money)), so any attempt to find specific jurisdiction based on that request would fail at the second step of the personal jurisdiction analysis.  Indeed, Plaintiff has failed to demonstrate how any actions Plaintiff allegedly took as Defendants' agent relate to Plaintiff's claims; instead, Plaintiff's claims arise out of Plaintiff's loaning money to Defendants.

Accordingly, Plaintiff fails to establish Defendants purposefully availed themselves of California.

### 2.       Purposeful Direction

The "purposeful direction" test requires Plaintiff to establish Defendants "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Axiom Foods, Inc.*, 874 F.3d at 1069 (quoting *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012), and acknowledging the "'effects test' derives from" *Calder v. Jones*, 465 U.S. 783 (1984)).

### a.       Intentional Act

The "intentional act" requirement refers "to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *Schwarzenegger*, 374 F.3d at 806.  Plaintiff has established Defendants took intentional acts through negotiating with Plaintiff about the terms of the loans and Plaintiff's stake in Project

13

United States District Court
Northern District of California

Ether.  *See Picot*, 780 F.3d at 1214 ("Weston committed an intentional act when he spoke with Coats about the technology.").  For the unlawful recording of a confidential communication claim (Penal Code 632), the intentional act is the recording of the July 31, 2023 virtual meeting.  So, the first prong is satisfied.

### b.      Expressly Aimed at the Forum State

The "express aiming" prong "asks whether the defendant's allegedly tortious action was 'expressly aimed at the forum.'"  *Picot*, 780 at 1214 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010)).  "Express aiming requires more than the defendant's awareness that the plaintiff it is alleged to have harmed resides in or has strong ties to the forum, because 'the plaintiff cannot be the only link between the defendant and the forum.'"  *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021) (quoting *Walden*, 571 at 285).  "'[S]omething more'—conduct directly targeting the forum—is required to confer personal jurisdiction."  *Id.* (quoting *Mavrix*, 647 F.3d at 1229).

Plaintiff has failed to demonstrate Defendants expressly aimed any conduct at California. Plaintiff makes no allegations supporting an inference Defendants specifically targeted California by soliciting investors or funding from the state.  Instead, the undisputed facts establish Plaintiff reached out to Defendants to begin the business relationship that led to the loans at issue. Accordingly, Defendants' contacts with Plaintiff were not the result of express aiming at California and instead resemble "random, isolated, or fortuitous" contacts that occurred because a California resident reached out to Zafar via electronic communication.  *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984).

Plaintiff, citing *Axiom Foods*, asserts "individualized targeting," or an allegation "a defendant 'engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state,'" can satisfy the express aiming requirement.  *Axiom Foods, Inc.*, 874 F.3d at 1069 (quoting *Washington Shoe*, 704 F.3d at 675).  But, *Axiom Foods* explained the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), changed the analysis, so "while a theory of individualized targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction."  *Axiom Foods, Inc.*, 874 F.3d

at 1070.  Indeed, the *Axiom Foods* court instructed courts to "look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connection to a forum." *Id.* (quoting *Walden v. Fiore*, 571 U.S. at 289); *see also Janus v. Freeman*, 840 F. App'x 928, 930 (9th Cir. 2020) ("In *Walden*, the Court expressly rejected the view that *Calder*'s effects test is satisfied merely by the defendant's commission of an intentional tort that is aimed at a person known to be a resident of the forum state.").  Interpreting all factual disputes in Plaintiff's favor, Plaintiff has only established Defendants' individualized targeting of Plaintiff, a California resident.  Plaintiff has not identified any additional activities sufficient to establish Defendants expressly aimed conduct at California.

So, Plaintiff has failed to establish Defendants expressly aimed their conduct at the forum state.

### c.   Causing Harm Defendant Knows Is Likely to Be Suffered in the Forum State

Plaintiff has established Defendants knew their conduct was likely to cause harm in California.  Plaintiff alleges "on August 16, 2022" Plaintiff told Zafar Plaintiff "resided in the California Bay Area."  (Dkt. No. 22-1 ¶ 4.)  So, Plaintiff has alleged Zafar knew Plaintiff lived in California, and therefore any foreseeable harm to Plaintiff would be harm within the forum state. Because, accepting Plaintiff's allegations as true, the harm was foreseeable, Plaintiff has established the third prong of the analysis.

### B.   Arising Out of or Relating to Defendant's Forum-Related Activities

Plaintiff's causes of action arise from Defendants' alleged failure to repay borrowed money and recording of Plaintiff without Plaintiff's consent.  (Dkt. No. 22 at 18-19 (Gelasio's contract- and fraud-based causes of action . . .  are each premised on Defendants' repeated promises to repay all borrowed sums" . . . .  "Gelasio's theft, conversion, unjust enrichment, and constructive trust causes of action . . . are centered on (i) the transfer of money from California to Defendants, and (ii) Defendants' subsequent refusal to return those borrowed sums and pay other owed consideration" and the "remaining wiretapping, breach of fiduciary duty, and declaratory relief causes of action" arise from Zafar recording Plaintiff to discuss the return of sums of money

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

and the same promises and loans to Defendants).

Plaintiff's causes of action arise out of or relate to the same conduct Plaintiff asserts establishes Defendants' personal jurisdiction in California. However, as explained above, none of the alleged actions demonstrate Defendants have the requisite minimum contacts necessary for the Court to exercise personal jurisdiction over Defendants.

### C. Reasonableness

Even if Plaintiff had established the requisite minimum contacts, Defendants have met their burden of proving the exercise of personal jurisdiction over them would be unreasonable.

The Ninth Circuit employs a multi-factor balancing test to determine the reasonableness of exercising personal jurisdiction over a non-resident defendant, assessing:

> 1) the extent of the defendant's purposeful interjection into the forum state's affairs;
> 2) the burden on the defendant;
> 3) conflicts of law between the forum and defendant's home jurisdiction;
> 4) the forum's interest in adjudicating the dispute;
> 5) the most efficient judicial resolution of the dispute;
> 6) the plaintiff's interest in convenient and effective relief; and
> 7) the existence of an alternative forum.

*Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991) (citations omitted). "No single factor is dispositive." *Silk*, 65 F.4th at 458.

Applying this test, the exercise of jurisdiction over Defendants would be unreasonable. First, as to the extent of the defendant's purposeful interjection into the forum state's affairs, Plaintiff has failed to demonstrate Defendants purposefully reached out to California or targeted California. So, this factor weighs against the exercise of jurisdiction.

Second, the burden on Defendants is large. Project Ether is a Hong Kong entity and Zafar lives in the United Kingdom. Plaintiff does not contend either entity has any presence in California. Given the distance involved, Defendants would be burdened if they were forced to litigate in a California forum. *See Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987) (acknowledging "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders"); *see also*

*Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995) ("Where the burdens are equal [between the plaintiff and the defendants in litigating in a foreign forum], the second factor tips in favor of [the defendants] because the law of personal jurisdiction is asymmetrical and is primarily concerned with the defendant's burden.").

The third factor (whether there are any conflicts of law between the forum and defendant's home jurisdiction), also weighs against exercising jurisdiction. Were Defendants in another state rather than another nation, this factor would be less a barrier to reasonableness. *See Vuori v. Grasshopper Cap. LLC*, No. 17-CV-06362-JCS, 2018 WL 1014633, at *16 (N.D. Cal. Feb. 22, 2018). But "a foreign nation presents a higher sovereignty barrier than another state within the United States." *Roth*, 942 F.2d at 623 (cleaned up); *see also Asahi*, 480 U.S. at 115 ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."). Because Defendants are residents of foreign nations, this factor weighs in favor of Defendants.

The fourth factor (the forum's interest in adjudicating the dispute) weighs slightly in favor of exercising jurisdiction because the injury occurred in California. *Keeton*, 465 U.S. at 776 ("New Hampshire has a significant interest in redressing injuries that actually occur within the State."); *Burger King*, 471 U.S. at 473 ("A State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." (cleaned up)). However, the parties incorporated Project Ether in Hong Kong, and Plaintiff has not articulated any reason why California would have any interest in a Hong Kong company doing business in the UK or a UK citizen doing business from the UK.

The fifth factor (the most efficient judicial resolution of the suit) weighs slightly against exercising jurisdiction. Gelasio and Zafar are likely to be the two main witnesses, so at least one party will be burdened by any choice of jurisdiction. Gelasio lives in California, and Zafar lives in the United Kingdom. Because "the law of personal jurisdiction is asymmetrical and is primarily concerned with the defendant's burden," this factor "tips in favor of" Defendants. *See Terracom*, 49 F.3d at 561.

While the sixth factor (the plaintiff's interest in convenient and effective relief) weighs in

United States District Court
Northern District of California

favor of exercising jurisdiction, the seventh factor (the existence of an alternative forum) weighs against exercising jurisdiction.  Hong Kong and the United Kingdom both are alternative forums for litigating this case.  Moreover, Plaintiff, as a co-founder of Project Ether, agreed to incorporate the company in Hong Kong and paid for the drafting of a founders' agreement stating the parties selected Hong Kong as the forum for any disputes.  Accordingly, both parties have demonstrated their interest in adopting Hong Kong law as the governing law for the company's disputes.

In sum, "[t]he balance of the seven factors reveals that a California district court cannot reasonably exercise personal jurisdiction over" Defendants.  *See Terracom*, 49 F.3d at 562; *see also Asahi,* 480 U.S. at 116 (concluding the exercise of jurisdiction over the defendant would be unreasonable "[c]onsidering the international context, the heavy burden on the [foreign] defendant, and the slight interests of the . . . forum State").   So, Defendants have met their burden of establishing the exercise of jurisdiction in this case would be unreasonable.

## SUPPLEMENTAL EVIDENCE

Approximately a week after the Court heard oral argument on Defendants' motion to dismiss, Plaintiff filed an ex parte application for leave to file supplementary material in connection with the pending motion to dismiss.  (Dkt. No. 32.)  Plaintiff stated his "continuing investigation into the jurisdictional facts of this case . . .  identified additional evidence" that, despite his diligence, he "was unable to present . . . in admissible form with his opposition brief." (*Id.* at 2.)  Defendants opposed the motion on procedural and substantive grounds.  (Dkt. No. 33.) "Notwithstanding the motion's procedural improprieties," the Court granted Plaintiff's request. (Dkt. No. 34.)

In the supplemental brief, Plaintiff presents evidence Defendants (1) pre-approved California residents to participate in an invite-only NFT pre-sale, (2) hired California-based counsel to file and prosecute U.S. trademark applications, and (3) registered their website through a company based in Arizona.  (Dkt. No. 37 at 4.)   He does not specify whether this evidence goes to purposeful direction or availment.  Either way, the Court is not swayed by the additional evidence.

First, Plaintiff submits two declarations from California residents.  (Dkt. Nos. 40 ¶ 2; 41 ¶

2.)   Kevin Song and Huyhn Diep attest "Zafar invited [them] to join Project Ether's private, early-access Discord channel" where members "regularly discussed [their] residency." (Dkt. Nos. 40 ¶ 3; 41 ¶ 3.)  Mr. Song and Mr. Diep state after Zafar learned they were California residents, Zafar added them to Project Ether's whitelist to participate in "an early-access sale of Project Ether NFTs." (Dkt. Nos. 40 ¶ 4; 41 ¶ 4.)  Plaintiff characterizes these interactions as evidence of "hyper-focused solicitations and enlist[ment] of numerous California residents to engage in sustained marketing efforts on Defendants' behalf," which he contends are sufficient to establish jurisdiction under the First Circuit's decision in *Plixer International, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 13 (1st Cir. 2018). (Dkt. No. 37 at 10.)  The Court disagrees with Plaintiff's characterization.  Communication with two users who happen to reside in California does not amount to hyper-focused solicitation of California residents, particularly when the declarants are only two of 1,750 users added to the whitelist. (Dkt. No. 42-1 at 2.)  Further, neither declarant states he purchased NFTs on Project Ether; Mr. Diep and Mr. Song merely attest to being placed on a "whitelist," (Dkt. Nos. 40 ¶ 4; 41 ¶ 4), which gave them the *option* of purchasing NFTs when the sale commenced. (Dkt. No. 38 ¶ 3.)  *Cf. Mavrix Photo*, 647 F.3d at 1230 (concluding the defendant "continuously and deliberately exploited" the California market when the defendant's website had "a specific focus on . . . California" and "[a] substantial number of hits to [the] website came from California residents." (quoting *Keeton*, 465 U.S. at 781)).  Outreach to these declarants are the sort of random, fortuitous, and attenuated contacts for which a defendant would not reasonably anticipate being haled into court.  *See Burger King*, 471 U.S. at 486.

Further, *Plixer*—which is not binding on this Court—is also inapposite because it analyzed jurisdiction under Federal Rules of Civil Procedure 4(k)(2), which permits a federal court to exercise jurisdiction when the claim arises under federal law and the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction.  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006).  The *Plixer* court thus focused on the defendant's nationwide contacts rather than its state-specific contacts.  A subsequent First Circuit decision made clear the *Plixer* court's analysis is not "guiding precedent" outside the Rule 4(k)(2) context.  *See Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 96 (1st Cir. 2024).  Indeed, the *Plixer* court itself

1  emphasized the limited reach of its holding.  *See Plixer*, 905 F.3d at 8 ("[W]e are extremely

2  reluctant to fashion any general guidelines beyond those that exist in law, so we emphasize that

3  our ruling is specific to the facts of this case.").

4       The section of *Plixer* that is applicable to this case appears in a footnote.  The district court

5  determined "sales to two [Maine] residents" were insufficient to establish specific personal

6  jurisdiction in Maine because the defendant "could not reasonably have expected to be haled into a

7  Maine forum" on this basis, and the plaintiff did not challenge this determination on appeal.  *Id.* at

8  4 n.4.  Here, too, communication with two potential customers who are California residents is

9  insufficient for purposes of specific personal jurisdiction.

10      As additional evidence, Plaintiff also provides trademark documents filed "by a California

11  attorney based out of Irvine, California," (Dkt. No. 39 ¶¶ 2-5), which he contends are significant

12  because they establish Defendants "'kept at least one employee or agent in [California].'"  (Dkt.

13  No. 37 at 12 (citing *In re Tezos Sec. Litig.*, No. 17-CV-06779-RS, 2018 WL 4293341, at *6 (N.D.

14  Cal. Aug. 7, 2018).)  But hiring a lawyer to assist with and advise on trademark applications is

15  different than keeping an employee or agent in California.  And contrary to Plaintiff's assertions,

16  *Plixer* is again inapposite.  In *Plixer*, the plaintiff sued the defendant for trademark infringement,

17  so the First Circuit considered the defendant's application for U.S. trademark protection in

18  deciding the defendant targeted the U.S. market.  *Plixer*, 905 F.3d at 4, 11.  Here, Plaintiff is not

19  suing for trademark infringement.  So, any allegations as to contacts with a trademark attorney

20  would fail at the second step of the purposeful availment analysis because the causes of action do

21  not arise out of or relate to the attorney's conduct.

22      Finally, Plaintiff provides evidence "Defendants hosted their website . . . in Arizona

23   . . . to (presumably) more quickly interact with U.S. customers."  (Dkt. 37 at 12.)  He does not

24  explain why a website hosted in *Arizona* constitutes purposeful availment of *California*, and the

25  cases he cites do not support his argument.  *Will Co. v. Lee,* like *Plixer*, involved jurisdiction

26  pursuant to Federal Rules of Civil Procedure 4(k)(2).  47 F.4th 917, 922, 924 (9th Cir. 2022).  So

27  in *Will*, the defendants' decision to host the website in the United States served as "good evidence

28  that they were motivated to appeal to viewers in the United States more than any other

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

geographical location." *Id.* Here, where the analysis is state-specific, hosting a website in Arizona has no bearing on Defendants' efforts to appeal to users in California. And in *Herbal Brands, Inc. v. Photoplaza, Inc.*, the Ninth Circuit explicitly delineated the reach of its holding. 72 F.4th 1085, 1095 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 693 (2024). "[O]ur holding answers only the narrow question whether a defendant's sale of a *physical* product to a consumer in the forum state via an interactive website constitutes conduct expressly aimed at a forum." *Id.* (emphasis added). Because Plaintiff has not alleged Defendants sold physical products, *Herbal Brands* is inapposite. Moreover, there are no allegations of actual sales to California; merely attestations from two California residents who were invited to purchase virtual art. (Dkt. Nos. 40 ¶ 4; 41 ¶ 4.) Finally, in *Herbal Brands*, the "[p]laintiff's claims—which allege[d] harm caused by Defendants' sales of products—clearly ar[o]se out of relate[d] to Defendants' conduct of selling those same products to Arizona residents." 72 F.4th at 1096. Here, Plaintiff's claims stem from personal loans he alleges the overseas Defendants failed to repay. These claims do not arise from Defendants' NFT sales—if any—in California.

## REQUEST FOR JURISDICTIONAL DISCOVERY

Plaintiff requests jurisdictional discovery. Initially, he requested discovery on Zafar's Coinbase account. (Dkt. No. 22 at 21.) In his supplemental opposition, he shifts to requesting that Defendants be required to produce or identify (1) IP addresses and geolocation data for Project Ether users, (2) IP addresses and geolocation data for users who purchased Project Ether NFTs, and (3) all revenue generated in Project Ether's mint from each participating jurisdiction. (Dkt. No. 37 at 16.) Plaintiff also insists Zafar be required to "sit for [a] deposition in connection with any of the matters raised" in the opposition and supplemental opposition. (*Id.*)

The Court DENIES Plaintiff's request for jurisdictional discovery. "In some cases, the operators of a website can be said to have expressly aimed at a forum where a website with national viewership and scope appeals to, and profits from, an audience in a particular state." *Herbal Brands*, 72 F.4th at 1092 (citations and quotation marks omitted). But in such cases, the claims directly arose out of and were related to the defendants' sales in the state. *Id.* at 1096. Not so here, where Plaintiff's claims relate to loans/financing provided to overseas defendants.

United States District Court
Northern District of California

Further, even assuming Project Ether users reside in California and/or Defendants derived substantial profits from NFT sales in California, such facts alone not warrant a finding of personal jurisdiction.  The Ninth Circuit cases analyzing personal jurisdiction in the context of a website considered, in addition to profits from the forum, whether the website "had a forum-specific focus" and whether the defendants "exhibited an intent to cultivate an audience in the forum." *Id.* at 1092 (collecting cases).  Here, Plaintiff has twice been unable to establish any efforts by Defendants to target California users or any California-specific focus to the website.  Further, even if Defendants derived some profit from NFT sales in California, this conduct would not amount to "purposeful interjection into [California's] affairs" so as to alter the Court's reasonableness analysis. *See Roth*, 942 F.2d at 623 (9th Cir. 1991).

## CONCLUSION

For the reasons explained above, the Court GRANTS Defendants' motion and DISMISSES the case without prejudice for lack of personal jurisdiction.

This Order resolves Dkt. No. 18.

**IT IS SO ORDERED.**

Dated: October 30, 2024

JACQUELINE SCOTT CORLEY
United States District Judge